Joyce JOHNSON and Robert Bandy, Administrators of the Estate of Leport Walton, Deceased, Plaintiffs–Appellees,

v.

CHAPEL HILL INDEPENDENT SCHOOL DISTRICT, et al., Defendants–Appellants.

No. 87–2825.

United States Court of Appeals, Fifth Circuit.

Aug. 30, 1988.

---

Jack Jackson, Tyler, Tex., for Chapel Hill Independent School Dist.

Larry R. Daves, Tyler, Tex., for Johnson and Estate of Walton.

Before REAVLEY, GARWOOD and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The district court, after a bench trial, found that defendants' decision not to renew the teaching contracts of two black school teachers was racially motivated. Defendants concede their liability to plaintiff Johnson and on appeal contest only the district court's calculation of her back pay award. Defendants challenge both liability and damages assessed against them in favor of plaintiff Walton. We affirm in part, reverse in part and remand this case to the district court.

## I.

### A.

Plaintiffs Joyce Johnson and Laura Walton were two of eleven teachers, six white and five black, whose contracts were not renewed by the Chapel Hill Independent School District (Chapel Hill ISD) at the end of the 1979–80 school year. Plaintiff Johnson exhausted administrative remedies and then sued in federal court, asserting causes of action under Title VII, § 1981, and § 1983. Laura Walton later joined the suit, asserting causes of action only under § 1981 and § 1983. Plaintiffs named as defendants the Chapel Hill ISD; Dr. Claude Harcrow, individually and in his official capacity as the superintendent of the Chapel Hill ISD, and the members of the Board of Trustees of Chapel Hill ISD, individually and in their official capacity.

Plaintiffs sought both equitable and legal relief and defendants timely filed a demand for jury trial. Plaintiffs moved to strike the jury demand on the ground that they were dismissing all legal claims, including all claims other than those for injunctive relief, back pay, and other equitable relief. The district court granted plaintiff's motion, and in August 1983 tried the case without a jury.

### B.

The trial record reveals that Walton joined the Chapel Hill ISD faculty in 1976. At that time, she was fifty-seven years old with eighteen year's teaching experience, a Master's degree in Elementary Education, and lifetime certification to teach all areas of elementary school at all levels. Before and after joining the Chapel Hill faculty, Walton taught primarily mathematics.

Walton's claim of intentional discrimination was based primarily on two items of circumstantial evidence. First, Walton contended that she was replaced by a white teacher who held only a bachelor's degree with little teaching experience. Walton admitted that credentials alone are not an adequate measure of a teacher's performance but insisted that she was more qualified than the teacher who replaced her. Walton also testified that she "understood" that a white teacher whose contract was not renewed was warned of his marginal performance and provided with counseling and assistance in an effort to improve his teaching skills. Walton testified that she, on the other hand, received no warning that her teaching was below par and received no assistance.

Plaintiff Johnson taught students in the school district's home bound program. Johnson went into the homes of students who because of illness or disability were unable to attend school. The school district contended at trial that it decided not to renew Johnson's contract in part because of her poor performance as a teacher and in part because the school district's projections for the coming school year showed that Johnson would not be needed to teach home bound students. Johnson

contended that the nonrenewal was racially motivated. Shortly after she learned of the nonrenewal, she complained to the EEOC. After she filed this complaint, the school district announced that its projections of need for teachers of home bound students turned out to be erroneous; positions for which Johnson was arguably qualified were later filled. Johnson contends that the board denied a position to her in retaliation for filing her complaint with the EEOC.

## C.

The Chapel Hill ISD Board of Trustees, composed of five whites and two blacks, unanimously voted to hire Claude Harcrow as superintendent of the district and he assumed that position in August of 1979. The Board gave Harcrow several mandates, including one to upgrade teaching staff and curriculum. Harcrow thus instituted a program designed to evaluate the strengths and weaknesses of his faculty, to improve the performance of individual teachers where possible, and to replace other teachers. To carry out this program, Harcrow and the Board adopted a system of teacher evaluations. Under the evaluation program a teacher's supervisor made scheduled and unscheduled visits to a classroom and rated the teacher's performance on a variety of factors. The teacher's supervisor then made a recommendation to Harcrow who then made his recommendations to the school board, which made final hiring decisions.

Harcrow testified that his primary goal in the teacher evaluation process was to obtain the best possible faculty for the Chapel Hill ISD. He also testified that when making hiring decisions he primarily considered credentials and qualifications, but also gave some consideration to race in an attempt to maintain or improve black representation on the school's faculty. Harcrow testified that race had not been a consideration in the decision not to renew the contracts of eleven teachers after the 1979–80 school year.

In carrying out his program, Harcrow necessarily relied upon the recommendations of a teacher's immediate supervisor. Among those on whom Harcrow relied to evaluate teachers were Jack Fry, a white administrator of programs, and Winston Teal, a black high school principal with immediate responsibility for plaintiff Walton. Both Fry and Teal testified that Harcrow had never suggested that they should consider race in deciding whether to recommend renewal of a teacher's contract. Both men testified that they had never perceived bias or prejudice on Harcrow's part.

Winston Teal testified that he recommended to Harcrow that Walton's contract not be renewed. Teal testified that he based this decision on a November 1979 evaluation of Walton's performance. The trial court rejected Teal's testimony because the court found that the evaluation was based on unduly subjective criteria and because the court concluded that even though the evaluation showed that Walton had some shortcomings it also showed that her performance was generally satisfactory.

The district court thus concluded that both Walton and Johnson were victims of intentional discrimination. The court awarded back pay to both plaintiffs, ordered reinstatement of both plaintiffs, and—to provide an incentive for reinstatement—awarded front pay to both plaintiffs.

Plaintiff Johnson found new employment during the 1980–81 school year, at a salary equal to and eventually greater than her salary at Chapel Hill ISD. Thus, she was awarded $10,000 in back pay and no front pay. The court refused to offset from the award $3,600 in unemployment benefits that Johnson collected before she found new employment.

Plaintiff Walton did not seek another teaching position after the 1979–80 school year. Instead, she received unemployment compensation and then took early retirement and drew a teacher's retirement pension. She also worked part time in a grocery store owned by her and her husband. The store showed no profit between 1980

and 1986 and Walton drew no salary from the business.

The court refused to offset from the award unemployment benefits and retirement benefits that Walton received. Because Walton only worked part time and drew no salary, the court found that she only partly fulfilled her duty to mitigate damages. The court therefore offset the back pay and front pay award by the amount that Walton could have earned working full time at minimum wage.

## II.

### A.

Appellants contend that the district court clearly erred in finding that defendants intentionally discriminated against Walton. Appellants attack as unprobative the evidence on which the district court relied, and assert that the trial court misconstrued or ignored defendants' evidence.

Appellants first argue that the trial court improperly considered past discrimination in the school district as probative evidence. The only record evidence of racial discrimi-

nation in the Chapel Hill ISD consists of the acknowledgement by defendants' witnesses, in response to the trial court's questions, that the school district had a history of racial segregation. Appellants contend that this evidence should be given no weight because every witness who testified on the subject, including those who acquiesced in the trial court's suggestion that racism had in years past been rampant in the Chapel Hill ISD, testified that the School district had been integrated without serious confrontations and expressed satisfaction with and pride in race relations in the schools and in the community.

Defendants next contend that the trial court's preoccupation with past discrimination caused the court erroneously to infer that Dr. Harcrow attempted to limit the number of black faculty members. According to appellants, Harcrow's testimony that he considered race in making hiring decisions was simply a recognition of the importance of affirmative action in hiring blacks on the faculty. We agree with appellants that the district court's conclusion from the testimony recited in the margin [1]

---

[1] On direct examination of Dr. Harcrow, plaintiffs' counsel asked whether Dr. Harcrow ever considered race when making hiring decisions. Dr. Harcrow testified as follows:

Q. Were you concerned during the '79–80 school term with the overall racial composition of your faculty? Were you at all concerned that you had too few blacks, too many blacks or any concern at all about your racial composition of your faculty?
A. I've attempted there, and other places, too, to maintain a good percentage and have attempted to staff. The records will show that from '79–80 to '80–81 that the percentage of blacks employed versus the whites employed rose perhaps a percentage point, from twenty-nine something to thirty point something and will also show that students, black persons to white, declined somewhat and, as I recall, because I've always attempted to try to select or have selected the best-qualified persons possible and at the same time to maintain the racial balance to staffing.
Q. Okay. Did you consciously consider race in making your employment decisions for the '80–81 school year of any applicant? Did you consciously consider the race of the applicant in making the employment decisions for the '80–81 school term?
A. Along with the consideration of credentials and qualifications.
Q. So you did consider race.

A. To a point of trying to maintain or slightly improve percentage, yes.
Q. Okay. Did you consciously consider race with regard to the non-renewals at the end of the '79–80 school term as a factor?
A. No, performance and/or reduction in staff and the evaluation of performance, whether tied in with that or just purely performance was the only thing considered.
On direct examination by defense counsel, Dr. Harcrow testified that race had not been a factor in any of the decisions affecting the plaintiffs in this case. On cross examination by plaintiffs' counsel, Harcrow testified as follows:
Q. Did you make any effort to keep the— maintain a faculty racial composition that was reflective of the student body racial complexion?
A. That was not a prime factor in selecting teachers.
Q. Okay. Was it a factor?
A. Not really.
Q. Excuse me?
A. Not really. We attempted to select on the battery of criteria of credentials, certainly, in order to have them qualified and then performance or promise of performance based on interview and reference checks and things of this nature.
Q. Okay.
A. We tried to select the best person of the candidates available, and sometimes we

that Harcrow conceded that he had placed a cap on the number of black teachers on the faculty is unwarranted. The only reasonable inference from this testimony is that Dr. Harcrow sought to maintain or increase, not limit, black representation on the Chapel Hill ISD faculty.

### B.

 A plaintiff proceeding on a disparate treatment theory of employment discrimination must show disparate treatment and discriminatory motive. *See e.g., Lee v. Conecuh County Board of Education,* 634 F.2d 959, 962 (5th Cir.1981). A plaintiff can establish a prima facie case, however, by producing evidence of disparate treatment alone. *Id.* An employer may then rebut this prima facie case by articulating a legitimate nondiscriminatory reason for the differential treatment. *Id.* at 963. Our review is of the record evidence as a whole. *Jett v. Dallas Independent School District,* 798 F.2d 748, 757 (5th Cir.1986).

 Walton's hearsay testimony that a similarly situated white teacher, who was not rehired, received warnings of inadequate performance and counseling while she received neither went unchallenged. Defendants did not object to the testimony, nor did they attempt to impeach or explain the testimony. The testimony, although hearsay, was properly before the trial court.

In addition to her testimony that a similarly situated white teacher received more favorable treatment, Walton also offered evidence, which was credited by the district court, that she was replaced by a less qualified white teacher. Defendants testified that the decision not to renew Walton's contract was based on Walton's marginal performance. Other evidence, however,

suggested that Walton's performance was generally satisfactory. In the face of this conflicting evidence, the trial court was required to assess the credibility of defendant's witnesses. We are ill-positioned to disturb this assessment. Although the evidence is less than compelling that the Board's decision to not rehire Ms. Walton was racially motivated, it is not our role to weigh the evidence. We cannot say the finding is clearly erroneous.

### C.

Appellant Harcrow contends that the district court clearly erred in finding him liable in his personal capacity to plaintiffs Walton and Johnson.

 A supervisor can be held personally liable for violations of § 1981 and § 1983 only upon proof that he intentionally discriminated against the plaintiff. *See Irby v. Sullivan,* 737 F.2d 1418, 1430 n. 23 (5th Cir.1984); *Lozano v. Smith,* 718 F.2d 756, 768 (5th Cir.1983). The district court concluded that Harcrow's involvement was more than vicarious because he reviewed the recommendations of his subordinates, developed his own recommendations based on input from his subordinates, and presented them to the school board for final action. The record demonstrates that this finding is clearly erroneous with regard to Walton.

The district court found and the record shows that Harcrow in making hiring recommendations to the Board ordinarily relied upon the evaluation of teachers made by school principals or other supervisors. In two instances in which Harcrow's subordinates disagreed over whether to recommend renewal, Harcrow decided whose recommendations to follow. In Walton's case,

would have a number of candidates, sometimes fewer.
Q. Okay. But the racial composition of your faculty was on your mind, was it not, at least at—?
A. I was aware that there was an attempt or an expectation that by federal government that there be representation.
Q. That there be what kind of representation?

A. Ratio or, at least, a balance, that there be representation of black teachers, white teachers, on the faculty.
Q. Okay. And that that relationship should be related to what? The number of black and white faculty should be in proportion to what?
A. If it's far out of proportion from number of students, there is a complaint, as I understand.
COUNSEL: Pass the witness.

however, the evidence reveals that Harcrow relied on the evaluations of Walton furnished by her supervisors Jack Fry and Winston Teal that Walton's performance was inadequate. They both recommended against rehiring her. No evidence was presented that Harcrow knew that the similarly situated male teacher received counseling and Walton did not. This record does not support an inference that Harcrow intentionally discriminated against Walton.[2]

■ The trial court also found that after Johnson complained to the EEOC about the nonrenewal of her contract, two positions became available for which she was arguably qualified. Defendants contended that they made a legitimate decision to hire more qualified persons for these positions. The trial court found that defendants refused to offer the positions to Johnson in retaliation for her filing a discrimination complaint with the EEOC. The record shows that Harcrow was aware of Johnson's EEOC complaint, that Johnson wrote to Harcrow complaining of discriminatory nonrenewal, and that Harcrow participated in the decision not to offer these positions to Johnson. While the evidence is again close, we cannot say that the district court committed clear error in rejecting defendants' proffered explanation and concluding that Harcrow personally retaliated against Johnson.

### D.

■ Appellants next contend that the district court erred by refusing to deduct unemployment compensation benefits from the back pay award to Johnson and from the back pay and front pay award to Walton. The district court has discretion to decide whether unemployment compensation should be deducted from a back pay or front pay award. *Merriweather v. Hercules, Inc.*, 631 F.2d 1161 (5th Cir.1980). We are persuaded that the district court did not abuse its discretion.

■ On a related point, appellants contend that teacher retirement benefits received by Walton should have been deducted from the award made to her. Whether retirement benefits should be offset from an award of lost wages depends on whether the benefits were provided or funded by the employer or the employee. *See Guthrie v. J.C. Penney Co.*, 803 F.2d 202, 209–10 (5th Cir.1986). Defendants below challenged the court's refusal to deduct the retirement benefits from the total award but provided no evidence showing the source of those benefits. We cannot therefore say that the trial court erred in refusing to deduct the retirement benefits.

### E.

Appellants argue that the trial court erred in awarding front pay to Walton because the plaintiffs waived their claims for front pay and other legal relief in order to avoid a jury trial requested by defendants.

■ Where feasible, reinstatement rather than front pay is the preferred remedy for a victim of employment discrimination. *See e.g., Goldstein v. Manhattan Industries Inc.*, 758 F.2d 1435, 1449 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). In appropriate circumstances, and appellants do not challenge the appropriateness of the circumstances presented here, front pay may be awarded as a supplement to reinstatement or to encourage the employer to promptly return the discrimination victim to his rightful job. *See James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 358 (5th Cir.1977), *cert. denied*, 434 U.S. 1034,

---

**2.** We are aware of an apparent anomaly in holding that although the school board is liable to Walton, Harcrow is not liable. All plaintiffs in this case *except* Walton asserted causes of action under Title VII, § 1981 and § 1983; Walton asserted claims only under §§ 1981 and 1983. Nevertheless, Walton and the defendants tried her action as though it were filed under Title VII. Although the school board may be held vicariously liable for the acts of its supervisory employees under Title VII, it cannot be held vicariously liable for violations of § 1981 and 1983. *Jett v. Dallas Independent School District*, 798 F.2d 748, 762–63 (5th Cir.1986). Because the board did not challenge Walton's theory either in the district court or on appeal, that intentional discrimination in hiring by board employees would render the board responsible to Walton under § 1981 and 1983, the board waived this defense.

98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *EEOC v. Enterprise Ass'n Steamfitters*, 542 F.2d 579, 590–91 (2d Cir.1976), *cert. denied sub nom Rio v. Enterprise Ass'n Steamfitters*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). Front pay has also been characterized as an extension of defendant's back pay liability until the employer makes an offer of reinstatement. *See Enterprise Ass'n Steamfitters*, 542 F.2d at 590–91. A back pay award under Title VII is considered equitable rather than legal in nature, and its character does not change simply because the award is made pursuant to § 1981 or § 1983. *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 n. 3 (5th Cir.1980). A front pay award then must be viewed as essentially equitable in nature; consequently, appellant's argument that appellees waived this claim is without merit.

### F.

■ Appellants next assert that because Walton did not seek another teaching position, she failed to exercise reasonable diligence in minimizing her damages. Appellants urge us to reduce Walton's award by the amount that she could have earned in another teaching position.

The record reveals that defendants produced no evidence of available teaching positions from May 1980 until trial in August 1983. The district court therefore correctly held that defendants were not entitled to a set off from the back pay award for this period. *See Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir.1972). At a September 1986 hearing on a motion for entry of judgment, defendants presented substantial evidence showing that suitable positions were available between 1983 and 1986. Four superintendents from school districts in the Tyler area testified that between 1983 and 1986 at least thirty vacant teaching positions per year were filled for which Walton was qualified. Plaintiffs presented no contrary evidence. Despite its finding that Walton was a qualified and experienced teacher, the trial court concluded that Walton was entitled to assume that because of her age it would be futile for her to seek employment and that therefore Walton exercised reasonable diligence to minimize damages. This finding is incompatible with the court's finding that Mrs. Walton was a competent, experienced teacher and is clearly erroneous.

In light of Walton's qualifications and years of experience as a teacher, she did not exercise reasonable diligence to mitigate damages by working in the family owned grocery store for no salary. Because Walton did not exercise reasonable diligence to minimize her damages, her award must be reduced by the amount she could have earned in a teaching position after August 1983.

### III.

The judgment of the district court in favor of Johnson and against all defendants is affirmed in its entirety. The judgment in favor of Walton and against Dr. Harcrow in his personal capacity is reversed. The judgment in favor of Walton and against Chapel Hill ISD, the individual board members and Harcrow in their official capacities is affirmed in all respects except for the amount of the front pay award. The case is remanded to the district court to reduce Walton's front pay award by deducting from that amount the net amount Walton could have earned in a teaching position after the trial in August 1983.

AFFIRMED in part; REVERSED in part; and REMANDED.