**Henderson R. ANDERSON, et al., Plaintiffs,**

v.

**HCA DEER PARK HOSPITAL, Defendant.**

**Civ. A. H–92–555.**

United States District Court, S.D. Texas.

Oct. 6, 1993.

Xavier Grenas, Grenas & Associates, Houston, TX, for plaintiffs.

Mark E. Edwards, Nashville, TN, Nancy L. Patterson, Fulbright & Jaworski, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

*Background.*

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"). Plaintiffs Henderson R. Anderson ("Anderson"), Gail K. Brown ("Brown") and Thomas J. Simmons ("Simmons") claim that their employer, HCA Deer Park Hospital ("HCA"), utilized a discriminatory selection process when it underwent a reorganization and reduction in force.

HCA answered plaintiffs' complaint, denying their claims for relief and alleging several affirmative defenses. The parties consented to a trial before this court, which was held on August 23–25, 1993. After considering the testimony, exhibits and arguments offered by the parties, this court is of the opinion that judgment should be entered for Defendant HCA.

*Findings of Fact.*

1. In early 1991, Defendant HCA was a 128–bed psychiatric hospital operating in Houston, Texas. It maintained six separate psychiatric units comprised of the Adult Unit, Adolescent Unit, Children's Unit, Women's Unit, Rapha Unit (a program based on Christian principles for Adults and Adolescents), and New Spirit Unit (for chemical dependency). All of these units employed mental health workers.

2. Plaintiffs Anderson, Brown and Simmons are adult African–Americans who were employed by HCA as mental health workers. Brown and Anderson were assigned to the Rapha Unit while Simmons was assigned to the Adolescent Unit. Based on patient census levels and staffing needs, mental health workers would on occasion work shifts on units other than their regularly assigned units.

3. Due to poor economic conditions, HCA was forced to undergo two reorganizations and reductions in force. The first occurred in September 1991 and the second in May 1992. HCA was ultimately forced to close in February 1993 due to adverse economic conditions. During the time HCA was conducting business, it was an employer engaged in an industry affecting commerce within the meaning of Title VII.

4. On September 19, 1991, HCA underwent its first reorganization and reduction in force. As part of HCA's reorganization, the decision was made to combine the six psychiatric units to form only three units. The Adolescent, Rapha and Children's Units were combined to form one single unit. The Adult and New Spirit Units were combined to form

one unit, and the Women's Unit was left as the third unit.

5. Shift times remained the same after the reorganization and reduction in force. The first shift started at 7:00 a.m. and ended at 3:00 p.m. The night shift started at 3:00 p.m. and ended at 11:00 p.m., while the graveyard shift started at 11:00 p.m. and ended at 7:00 a.m. Some units required staffing twenty-four hours a day, seven days a week, depending on patient census and acuity.

6. The reduction in force was hospital-wide and resulted in the layoff of sixteen employees in twelve different job classifications, including mental health workers. Of the sixteen who were terminated, seven were black, six were white and three were hispanic. Anderson, Brown and Simmons are three of the black employees who were terminated.

7. The criterion used to determine which mental health workers would be retained was based on the continuous full-time seniority an employee had on his or her assigned shift and unit. Each unit was viewed as a separate entity. Thus, an employee who had continuously worked the graveyard shift on the Adolescent Unit would have more seniority for that shift in the newly combined Children's Unit over an employee who never worked the graveyard shift or Children's Unit.

8. With respect to the reduction in force that affected mental health workers, a decision was made to retain only one full-time mental health worker per shift on each new unit, thereby reducing the number of full-time equivalent or "FTE" positions.

9. Overall seniority with HCA was not the criterion used because HCA did not want an employee with less unit and shift seniority to "bump" another employee who had been working longer in a particular unit and at a particular shift time.

10. Based on the criterion that was utilized, mental health workers Anderson, Brown and Simmons all had less seniority on their assigned units and shifts than the employees who were retained.

11. This selection criterion was proposed by the Director of Personnel, Robert Fonte-not ("Fontenot"), to the Hospital's Administrative Council, which was comprised of the Administrator, Assistant Administrator, Director of Nursing, Director of Marketing, Controller and Fontenot. The criterion was approved by the Administrative Council with final approval coming from HCA's Administrator, A. Joyce Bossett. Ms. Bossett is an African–American.

12. Prior to the reorganization, there were fourteen mental health workers, nine of whom were black and five of whom were white. As a result of the reorganization and reduction in force, five mental health workers were terminated, all of whom were black.

13. Although the selection process resulted in the termination of only black mental health workers, this same process was also utilized in terminating registered nurses, which resulted in the termination of a white employee who had more seniority than at least three black employees who were retained. Kathryn Ellis, a white registered nurse who was hired by HCA on April 27, 1989, was terminated while Lionel Lynch (hired March 15, 1990), Olive Moore (hired January 22, 1991) and Lincoln Wells (hired January 29, 1991), all black registered nurses with less seniority, were retained.

14. Brown testified that she had no evidence that her termination was due to race discrimination and further stated that she was not "positively sure" that her termination was the result of racial discrimination. In fact, when asked why she felt she had been terminated, Brown answered, "because of money."

15. Simmons testified that the only explanation he could think of for his termination was racial discrimination. He failed, however, to provide any evidence to support his belief.

16. Anderson testified that he had no evidence of race discrimination.

17. Brown, Simmons, and Anderson were informed of their termination by the Director of Nursing, Ann Harper ("Harper"), who is white.

18. Neither Brown nor Simmons had any previous complaints or difficulties with Har-

per prior to their termination in September 1991. Brown and Simmons likewise had no complaints about their employment until their layoff.

19. Although Anderson testified that he had previous complaints regarding Harper's management style, he did not consider the questionable conduct to be motivated by any racial animus. He had no other complaints about his employment prior to his layoff.

20. HCA's patient census continued to fluctuate following the September 1991 layoff. When necessary, due to census levels or patient acuity, the hospital utilized mental health workers from the float pool.

21. It was less expensive for the hospital to utilize float pool mental health workers on an as-needed basis than it was for the hospital to maintain a larger full-time staff of mental health workers, as it had prior to the September layoff.

22. At the time of their layoff, Anderson, Simmons and Brown were all offered applications for positions in the hospital's float pool. As such, they would have been subject to being called in to work on an as-needed basis. HCA did not have a policy which required laid-off employees to be offered float pool positions. This opportunity was extended to enable laid-off employees to continue earning income.

23. Plaintiffs Brown and Anderson did not submit applications to work in the hospital's float pool. They wished to obtain regular, full-time employment instead.

24. Only Simmons applied for and worked in the float pool following his layoff.

25. Simmons worked a total of eighty-eight shifts on float pool status between September 19, 1991, and May 2, 1992.

26. Although Brown refused to apply for work in the float pool, shortly following her layoff, she was called on at least three occasions by HCA to work float pool hours. Each time, she was offered an eight-hour shift. She declined to work any of the twenty-four float pool hours offered.

27. At the time of the layoff, Simmons, Anderson and Brown were also given a listing of job openings at other local HCA facilities. There was no hospital policy requiring that any such list be provided to laid-off employees. Despite this, the list was compiled and provided to the laid-off employees by Fontenot to assist them in finding alternate employment.

28. In late February 1992, a need arose to create two additional full-time mental health worker positions. These job openings were posted in the hospital by Fontenot in accordance with normal procedures. There were no black applicants for these positions. Two white, float pool mental health workers, Donna Bocanegra and Louis Bonin, applied and were selected for the newly created full-time positions. Subsequently, the hospital changed their status from float pool to full-time because the hospital did not want to hire new full-time mental health workers.

29. Simmons, who had been working float pool hours at the hospital, began requesting and working fewer float pool hours at HCA in February 1992. He testified that it was therefore possible that he failed to see the posting of these job openings.

30. On May 22, 1992, the hospital was forced to undergo another reduction in force due to business conditions. The selection criterion for the May layoff was overall seniority. A total of seventeen employees in six job classifications were laid off at this time, including seven mental health workers. Of the individuals laid off, thirteen were white, three were Hispanic and one was black.

31. Of the seven mental health workers who were laid off, six were white and one was black. Bocanegra and Bonin were among those laid off at that time.

32. Even if Simmons, Brown and Anderson had been retained in the September 1991 layoff, they would have been terminated in the May 1992 layoff, due to their lack of total hospital seniority over the remaining mental health workers.

33. Plaintiffs do not dispute the fact that they each would have been terminated in the May 1992 layoff due to lack of seniority.

34.  None of the plaintiffs has offered any evidence beyond his or her subjective belief to support the claim of racial discrimination.

35.  Brown, Simmons and Anderson all found employment following the layoff.

36.  Because all three of them would have been laid off in the May 1992 reduction in force had they not been laid off in September, any backpay liability calculation must be based on the thirty-five week time period between September 19, 1991, and May 22, 1992.

37.  At the time of their termination, plaintiffs were each paid two weeks severance pay.  Plaintiffs were also paid for any accrued vacation time.

38.  Anderson was earning a base rate of $10.87 per hour at the time of the layoff.  Had he remained employed, he would have earned $17,108.00 at HCA between the September 1991 layoff and the May 1992 layoff.  This is based on his testimony that he worked thirty-two hours per week on the weekend shift with a combined shift differential and base rate of $12.37 per hour ($395.84/week) and eight hours per week on the 3:00 p.m. to 11:00 p.m. shift with a combined shift differential and base rate of $11.62 per hour ($92.96/week).    [ ($395.84 + $92.96) × 35 weeks].

39.  Anderson received severance pay of $869.60 and unemployment benefits in the amount of $1,861.00.

40.  Anderson worked at Bellaire General Hospital beginning on a part-time basis and then going to a full-time basis from October 21, 1991, through April 20, 1992, and earned a total of $7,115.60.

41.  Anderson began working at Pasadena General Hospital on a part-time basis on February 27, 1992, and continued on a part-time basis for a period of seven weeks until April 20, 1992.  According to his testimony, Anderson worked approximately thirty-two hours per week during this time period, for a total of 223 hours at $10.50 per hour.  Thus, Anderson earned a total of $2,352.00 for part-time employment at Pasadena General.  Anderson became full-time at Pasadena General on April 20, 1992.  Five weeks elapsed between April 20, 1992, and May 22, 1992,

which was the date of HCA's second layoff.  During this period of time, Anderson worked 200 hours (40 hours/week) at Pasadena General at $10.50 per hour for a total of $2,100.00.  Thus, Anderson earned a total of $6,552.00 at Pasadena General between February 22, 1992 and May 22, 1992.

42.  Anderson had no out-of-pocket health care costs in 1991.  His out-of-pocket costs until May 22, 1992, amounted to $151.42.

43.  Anderson's total lost pay and benefits, taking into account his interim earnings, is $2,961.22.

|  |  |  |
|---|---|---|
| $17,108.00 |  |  |
| − 869.60 | – | severance |
| − 1,861.00 | – | unemployment |
| − 7,115.60 | – | Bellaire General |
| − 2,352.00 | – | Pasadena General, part-time |
| − 2,100.00 | – | Pasadena General, full-time |
| + 151.42 | – | out-of-pocket health expenses |
| $ 2,961.22 |  |  |

44.  Plaintiff Brown was earning $9.17 per hour at the time of her layoff.  Had Brown remained employed, she would have earned $12,838.00 at HCA during the thirty-five week period between the September 1991 layoff and the May 1992 layoff.  This amount is based on forty hours per week at the base rate, as Brown was assigned to the 7:00 a.m. to 3:00 p.m. shift, which did not pay a shift differential.  [35 weeks × 40 hours per week × $9.17 per hour].

45.  Brown testified that she found interim employment with Pasadena General Hospital on May 3, 1992, at $10.00 per hour.  She further testified that she worked forty hours a week during the three week period between May 3 and May 22, 1992, and earned $1,200.00.

46.  Brown also collected unemployment benefits of $7,840.00 and severance pay (less accrued vacation) of $733.00.

47.  Brown incurred $108.00 in additional medical expenses that would have been reimbursed by her medical coverage through the hospital, and $156.00 in obtaining medical insurance for herself.  This is a total of $264.00 in lost benefits.  Brown would not have vested in the retirement plan prior to the May 1992 layoff.

48. Brown's lost pay and benefits total, at the most, $3,329.00, taking into account all interim earnings.

```
  $12,838.00
 − 1,200.00   –   Pasadena General
 − 7,840.00   –   unemployment
 −   733.00   –   severance
 +   108.00   –   medical expenses
 +   156.00   –   medical insurance
 ───────────
  $ 3,329.00
```

49. Simmons was earning a base rate of $8.83 per hour at the time of the September layoff. He would have earned $13,622.00 at HCA between the time of the September 1991 layoff and the May 1992 layoff, based on his testimony that he regularly worked thirty-two hours per week on the 3:00 p.m. to 11:00 p.m. shift, with a combined shift differential and base rate of $9.58 per hour ($306.56/week) and eight hours per week on a weekend shift with a combined shift differential and base rate of $10.33 per hour ($82.64/week). [ ($306.56 + $82.64) × 35 weeks].

50. Simmons began working approximately forty hours a week at Pasadena General Hospital one month prior to his layoff for about the same rate of pay he received at HCA. For approximately one month, Simmons was working a total of eighty hours a week between HCA and Pasadena General. Simmons stated on direct examination that he did not look for another job following his layoff from HCA because he was already working at Pasadena General and because he had money in savings. Simmons continued to work at least forty hours a week at Pasadena General from September 19, 1991, through mid–November, 1992, when he resigned due to personal problems.

51. Simmons received severance pay of $706.40. He did not apply for unemployment benefits.

52. Additionally, Simmons worked eighty-eight float pool shifts at HCA for approximately 704 hours between September 19, 1991, and May 1992. It was stipulated at trial that Simmons worked thirty-four weekend shifts, thirty-three 3:00 p.m. to 11:00 p.m. shifts and twenty-one 7:00 a.m. to 3:00 p.m. shifts. It was further stipulated that he earned $3,128.00 for the weekend shifts, $2,838.00 for the 3:00 p.m. to 11:00 p.m. shifts and $1,806.00 for the 7:00 a.m. to 3:00 p.m.

shifts, for total interim earnings of $7,772.00 from HCA.

53. Simmons had no out-of-pocket health care costs.

54. Simmons' total lost pay and benefits, taking into account the above interim earnings, is $5,143.00.

```
  $13,622.00
 −   706.40   –   severance
 − 7,772.00   –   HCA interim earnings
 ───────────
  $ 5,143.00
```

*Conclusions of Law.*

1. This court has jurisdiction over the parties and the subject matter of this case.

■ 2. A *prima facie* case creates a rebuttable presumption of intentional discrimination. A plaintiff may establish a *prima facie* case of discrimination by proving: (1) membership in a protected group; (2) qualification for the position; (3) an adverse employment action; and (4) replacement by a person not in the protected group. *Texas Dep't. Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1980); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). A *prima facie* case may also be established by showing that the plaintiffs are members of a protected class; they were qualified for their positions; and employees outside the protected class were treated more favorably. *Waggoner v. City of Garland,* 987 F.2d 1160, 1163 (5th Cir.1993); *Johnson v. Chapel Hill Indep. School Dist.,* 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R.R.,* 760 F.2d 633, 639 (5th Cir. 1985).

■ 3. Once the plaintiff has come forth with sufficient evidence to establish a *prima facie* case, defendant must articulate a legitimate, non-discriminatory reason for any alleged unequal treatment. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824.

■ 4. Once a defendant has articulated a legitimate, non-discriminatory reason for its actions, the *prima facie* case is dissolved and the burden shifts back to the plaintiff to prove at a "new level of specifici-

ty" that the reason articulated by the employer is not true but is only a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. at 255, 101 S.Ct. at ——); *Waggoner v. City of Garland,* 987 F.2d at 1164; *Wood v. Exxon Corp.,* 674 F.Supp. 1277, 1285 (S.D.Tex. 1987); *Smith v. Eastern Airlines, Inc.,* 651 F.Supp. 214, 219 (S.D.Tex.1986). The ultimate burden of persuasion remains at all times with the plaintiffs. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

■ 5. In order to show pretext, the plaintiffs must show both that the reason for the discharge as put forth by the defendant is false, and that discrimination was the real reason for the discharge. *Id.,* —— U.S. at ——, 113 S.Ct. at 2752. It is not enough just to disbelieve the employer; there must also be a demonstration of intentional discrimination. *Id.*

■ 6. A plaintiff's subjective belief of discrimination, however genuine, cannot alone be the basis for judicial relief. *Little v. Republic Ref. Co.,* 924 F.2d 93, 94 (5th Cir. 1991); *Sherrod v. Sears, Roebuck & Co.,* 785 F.2d 1312, 1316 (5th Cir.1986); *Elliot v. Group Medical & Surgical Serv.,* 714 F.2d 556, 567 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984); *Taylor v. Houston Lighting & Power Co.,* 756 F.Supp. 297, 300 (S.D.Tex.1990).

■ 7. Title VII of the Civil Rights Act of 1964 protects employees against racial discrimination in the terms and conditions of employment. It does not, however, afford minorities special preference or place upon the employer an affirmative duty to accord minorities special treatment during layoffs. *See Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

■ 8. In the instant case, HCA has articulated a legitimate, non-discriminatory reason for the layoff of all three plaintiffs. Simmons, Anderson and Brown, who continue to bear the burden of persuasion, have failed to demonstrate that HCA's articulated reason is merely a pretext for race discrimination. *St. Mary's Honor Center v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

9. HCA demonstrated that it was suffering economic losses which precipitated the need for the hospital reorganization and reduction in force in September 1991. The only evidence the plaintiffs offered to support a claim of race discrimination is that the selection of which mental health workers would be retained was based on a criterion other than overall hospital tenure. The fact that HCA utilized a different seniority analysis than straight seniority for determining which workers would remain on the new units and shift times is not, in itself, discriminatory, as both blacks and whites were affected by this methodology. *See Jones v. Unisys Corp.,* 829 F.Supp. 1281 (D.Utah 1993).

■ 10. The court recognizes that termination procedures are susceptible to discriminatory application and should be carefully scrutinized. *See Ramirez v. Hofheinz,* 619 F.2d 442, 446 (5th Cir.1980); *Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972). Plaintiffs have made no showing, however, that the selection criterion utilized in the layoff was applied to them in a discriminatory manner because of their race. Were the court to conclude that a different method for selecting candidates for layoff might operate more fairly, this would not assist plaintiffs, as the discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers." *Waggoner v. City of Garland,* 987 F.2d at 1165. *See also Furnco Constr. Co. v. Waters,* 438 U.S. 567, 576–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988).

■ 11. Plaintiffs in this case have submitted no evidence of racial discrimination other than their own subjective beliefs. This is legally insufficient to support a claim under Title VII. Plaintiffs have failed to show that HCA used race as a factor in its decisions to reduce the force at the hospital. In

a disparate treatment case such as this, "liability depends on whether the protected trait ... actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). "Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Id.*

 12. Title VII incorporates the traditional mitigation of damages rule into its remedies provision, which imposes upon the complaining party a duty to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position lost. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982). Brown, Simmons and Anderson all presented credible evidence about seeking and obtaining equivalent work, thereby satisfying their duty to mitigate damages.

13. It is within the court's discretion whether to discount a backpay award by the amount of unemployment compensation earned by the plaintiffs during the relevant period. *Johnson v. Chapel Hill Indep. School Dist.,* 853 F.2d at 382; *Matherne v. Wilson,* 851 F.2d 752, 762 (5th Cir.1988). This court is of the opinion that unemployment compensation should be subtracted to insure that plaintiffs who prevail are accorded a make-whole remedy rather than a double recovery.

14. Because Plaintiffs have failed to establish that race was a motivating factor in HCA's decision to terminate Brown, Anderson and Simmons in the September 1991 layoff, they have failed to prove that HCA violated Title VII of the Civil Rights Act of 1964.

15. Any conclusion of law more properly characterized as a finding of fact is hereby adopted as such. Any finding of fact more properly characterized as a conclusion of law is hereby adopted as such.

*Conclusion.*

For the foregoing reasons, this court orders that Plaintiffs take nothing and judgment be entered for HCA.

### FINAL JUDGMENT

In accordance with this court's findings of fact and conclusions of law set forth in its Memorandum and Order signed October 5, 1993, the court enters final judgment in favor of Defendant HCA Deer Park Hospital. Plaintiffs Henderson R. Anderson, Gail K. Brown, and Thomas J. Simmons shall take nothing by their suit.

This is a FINAL JUDGMENT.