**Wen–Hsien LO, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver of First City, Texas—Houston, Defendant.**

**Civ. A. H–93–766.**

United States District Court,
S.D. of Texas.

March 15, 1994.

Rodney E. Brisco, Brisco & Owsley, Houston, TX, for plaintiff.

Susan Cone Kilgore, FDIC, Legal Div., Houston, TX, for defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

*Background.*

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Texas Commission on Human Rights Act, TEX.CIV.STAT.ANN. art. 5221k ("TCHRA"). Plaintiff Wen–Hsien Lo claims that his former employer, First City, Texas—Houston, N.A. ("First City"), now a bank in receivership with the Federal Deposit Insurance Corporation ("the FDIC"), terminated him because of his age, race, and national origin.

The parties consented to a trial before this court, which was held on January 25–27, 1994. A jury was impaneled and found against Lo on all of his claims of employment discrimination. With respect to Lo's claims of age discrimination, the jury's findings are dispositive. The jury's determination regarding Lo's claims of race and national origin discrimination, however, is advisory only. After considering the testimony, exhibits and arguments offered by the parties, this court is of the opinion that judgment should be entered for the FDIC in accordance with the jury's verdict.

*Findings of Fact.*

1. First City was a bank operating in Houston, Texas until October 30, 1992, when the Office of the Comptroller of the Currency closed it and the FDIC was appointed as its receiver.

2. Plaintiff Wen–Hsien Lo ("Lo") is of the Asian race and of Chinese national origin. He was hired by First City in December 1987 as an asset/liability analyst in the Assets and Liability Management Department ("Asset/Liability Department"). This position required Lo to manage the assets-to-liabilities of the bank and to "hedge" the bank's risks. Hedging required Lo to identify sources of potential income that would enable the bank to invest money earning a higher interest rate than the rate at which the bank was loaning money to others. Lo utilized various asset/liability computer models to simulate results of anticipated transactions. He continued in this position until he was laid off on March 12, 1991.

3. Lo was hired by Charles Franckle ("Franckle"), who was in charge of the Asset/Liability Department. There was one other analyst, Greg Oniu ("Oniu"), in the department at the time Lo was hired. Approximately one month after Lo started working, Franckle left First City, and Oniu and Lo performed all of the functions and duties of the department until Franckle's replacement was hired.

4. Shortly after Lo started working, the Asset/Liability Department came under the supervision of the Treasury Department. Mark Peterson ("Peterson"), the Executive Vice President and Treasurer of First City, headed the Treasury Department.

5. On August 25, 1989, Paul Chollett ("Chollett") was hired as the Manager of the Asset/Liability Department to fill the vacancy created by Franckle's departure. Chollett created the position of senior asset/liability analyst and promoted Oniu to that position.

6. In December 1989, Chollett determined that an additional asset/liability analyst was needed. He hired Teng–Man Pauline Dunglinson ("Dunglinson"), who is also of the Asian race and Chinese national origin. Lo then became a hedging analyst and no longer performed many of the other asset/liability management functions, which were assigned to Dunglinson.

7. Lo testified that although he was "shocked and disappointed" when he was not promoted like Oniu, and when his job functions were reassigned, he did not feel that he was being discriminated against.

8. Lo went to Chollett to discuss his job and the reassignment of duties. When Lo expressed dissatisfaction, Chollett mentioned that Lo might prefer trading. Chollett told Lo that he would discuss a potential reassignment with Peterson. Lo also talked directly to Peterson regarding a job reassignment.

9. Lo met with Peterson on several occasions, which Peterson characterized as counseling sessions. When Lo questioned Peter-

son regarding Chollett's suggestion of a trading position being created for Lo, Peterson responded that he thought that this would be a good idea. A transcript of a taped conversation, recorded surreptitiously by Lo, reveals that Peterson also stated:

You instinctively, ..., it's something with you Chinese guys, you like to trade. All Chinese guys like to trade and you like to trade. You like market orientation, and ahh, I think that's what you'd want, I think that's what you should try to get. I don't know whether I can get this for you or not, I don't know how much you want to trade ... but I am willing to push to give you the opportunity to trade.

10. At trial, Peterson testified that although he thought this was not the most appropriate thing to say, he was trying to create a position in which Lo would have interest. He also stated that he would have to justify this position to his superiors in order to get the allocation of funds to assist Lo. Peterson further testified that Lo had told him that he did not like what he was doing and that he was interested in trading. It was clear to Peterson, as a result of his many discussions with Lo, that Lo's perspective was more market active and futures and interest rate oriented than others in the Asset/Liability Department. In addition, Peterson testified that during his college years, he had studied in Asia and had learned that the Chinese had a long history of trading and that other cultures attempted to emulate the Chinese in this area.

11. Peterson told Lo that he would have to teach Chollett how to do hedging before Peterson would transfer Lo to a trading position. Lo testified that he looked upon this favorably because Chollett was his boss and it would enable Lo to get better acquainted with him.

12. Lo testified that after his discussion with Peterson, he did not file an employment discrimination claim because he thought that it would be inappropriate and that "doors were open for him."

13. Beginning in 1990, due to a change in economic conditions, First City altered its risk management procedures and reduced its hedging activity.

14. After Oniu resigned in February 1990, Chollett assigned the bulk of Oniu's former duties to Dunglinson and asked Lo to take care of the basic assumptions in asset/liability management. First City then sought to hire a replacement for Oniu as well as another asset/liability analyst.

15. In June 1990, Chollett hired Ann Tia Hopkins ("Hopkins"), who is of Mexican national origin, to work as an asset/liability analyst.

16. When Oniu left, Lo expressed an interest to Chollett about being promoted to senior asset/liability analyst because the trading position had not materialized. According to Lo, when he approached Chollett about filling Oniu's vacancy, Chollett told him he did not need to fill out an application because he was already employed within the department.

17. Priscilla Thomas ("Thomas") was hired in June 1990, as senior asset/liability analyst, filling the vacancy created by Oniu's departure. Although Thomas did not have any experience specifically with hedging, she did have substantial financial experience. Thomas is a Certified Public Accountant and had formal training and experience in a variety of financial services industries, including banking. Prior to joining First City, Thomas worked for an international accounting firm, Arthur Andersen & Company, for six years and was a manager in the Financial Services Division at the time she left. Lo, on the other hand, had three years prior experience in asset/liability management, but not in the banking industry. Additionally, Lo had minimal experience supervising other employees.

18. Without regard to the discrepancy in experience, Lo was upset that Thomas was hired to fill the senior asset/liability analyst position. Lo contended that the decision to hire Thomas instead of promoting him was because she was twenty-nine years old and Lo was forty-three years old. He also contended that because of his Asian race and Chinese national origin, Chollett and Peterson would only consider Lo for a trading position. Lo asked to speak with Chollett and Peterson about this matter.

19. Chollett and Peterson explained to Lo that Thomas was better suited for the position, which entailed management responsibilities. They stated that although Lo had a strong background in technical functions, he was not as qualified for a management position.

20. According to Dunglinson, upon Oniu's departure, a variety of tasks were assigned to Lo, but he was uncooperative and the work given to him usually was not completed in a timely manner or returned with only a small portion of the work completed. Dunglinson testified that although Chollett split Oniu's responsibilities between her and Lo, she would often have to complete Lo's portion of work after she completed her own. She also stated that on numerous occasions when the department was pressed for time in meeting a deadline, Lo refused to assist with making copies, delivering notebooks and other tasks necessary to get the job done.

21. Chollett confirmed Dunlingson's assessment of Lo, noting that he and Peterson had several discussions with Lo regarding his performance and received assurances that he would change. According to Chollett, Lo told them that he felt he should be in a higher position and should not have to perform repetitive, mundane tasks. With the passage of time, Chollett noted only a slight change in Lo's attitude and approach to his job.

22. On February 26, 1991, Lo was given a written performance evaluation by Chollett, which had been prepared earlier. Chollett stated that while overall Lo had attained expectations, he needed to improve in several areas. Chollett found that at times, Lo was reluctant to assist the asset/liability team with the database preparation. Chollett noted that although Lo was improving, he still had difficulty working with others as a team. Chollett also stated that Lo had difficulty communicating his ideas and findings. Finally, Chollett noted that Lo needed to "think through the big picture" when preparing his analysis.

23. In February 1991, First City employees were notified that there would be a layoff effective March 1991. In accordance with First City's position elimination procedural guide, a written comparative analysis and evaluation of performance was conducted on each of the employees within the Asset/Liability Department to assess whether any of the positions could be eliminated.

24. Lo received the lowest rating among the asset/liability analysts on the comparative analysis and evaluation of performance, while Dunglinson was given the highest rating, and Hopkins followed Dunglinson. The "comments" section indicates that while Lo performed in a satisfactory manner, his tracking and hedging abilities would be less of an important function with the downsizing of the department. The comparative analysis also states that Lo needed improvement in planning and organizing, prioritizing his work, communicating his ideas, and interacting with his co-workers. The comparative analysis performance evaluation is dated March 5, 1991, although Chollett and Peterson did not sign it until March 6, 1991.

25. On March 5, 1991, Peterson signed a request for position elimination, which was forwarded to the Human Resources Department. In the request, Peterson stated that in conjunction with the overall corporate strategy to re-evaluate the effectiveness and efficiency of business units, the elimination of one asset/liability position was in order. Based on the performance evaluations of the individuals within the Asset/Liability Department, it was decided that Lo would be terminated. Chollett explained that both the comparative analysis and the request for position elimination documents were drafted on the same date, but were signed in the order in which they were completed by the typist.

26. The Equal Employment Opportunity Commission ("EEOC") investigated Lo's allegations of employment discrimination. According to the EEOC's determination letter, the job functions performed by Lo, market and hedging strategies, were considered to be the least important in the group reorganization. The EEOC also found that Lo's performance rating was the lowest of the analysts and that there was no evidence to show that his sex, race, national origin or age were factors in his selection for layoff.

27. Lo was not the only individual who was terminated as a result of this reorganization. First City eliminated one hundred thirty-nine (139) positions in the March 1991 layoff and another five hundred nine (509) positions during the remaining months of 1991.

28. Due to the loss of millions of dollars each day by First City, the bank eliminated five hundred ninety-nine (599) positions before it was closed on October 30, 1992. All First City employees ceased being employed by First City on October 30, 1992, but most remained in varying capacities with its successor until February 11, 1993. If Lo had not previously been laid off, the evidence suggests that he would have continued being employed by the bank or its successor until February 11, 1993.

29. Lo exercised reasonable diligence in attempting to find comparable employment following his termination. He sent out a number of letters and resumes. Although he had some interviews, he was not successful in obtaining comparable employment until late 1993. Lo taught mathematics at Houston Community College during the fall semester of 1992 and the spring semester of 1993. Lo satisfied his duty to mitigate damages.

30. At the time of his layoff, Lo was earning $39,727.00 per year. Had Lo remained employed at this position with First City until February 11, 1993, and had not been promoted, he would have earned $74,750.00.

31. Lo received unemployment compensation of $11,280.00 and interim earnings of $18,500.00 from March 12, 1991, until February 11, 1993. Lo also received three pay periods' severance pay for a total of $4,875.00.

32. Lo's out of pocket health care expenses from March 12, 1991, until February 11, 1993, totaled $2,560.00. He also lost his employer's contributions to the thrift savings plan in the amount of $4,485.00 from March 12, 1991, until February 11, 1993.

33. The parties stipulated that in the absence of a promotion, Lo's lost pay and benefits for wrongful termination totaled $65,-350.00, taking into account all interim earnings.

34. If Lo had been promoted on May 22, 1990, the date Thomas was hired, he would have earned an additional $7,000.00, up to the time of his layoff. This is the difference between Lo's salary and Thomas' salary from May 22, 1990, until March 12, 1991.

35. If he had been promoted, and had not been laid off, Lo would have earned $16,-330.00 from May 22, 1990, until February 11, 1993. Thus, as the parties stipulated, his total lost pay and benefits for wrongful termination would have been $88,780.00.

36. Upon instructions of the court and after deliberation, an advisory jury found that neither Lo's race nor his national origin was a motivating factor in the employment decisions at issue.

37. The court likewise finds that Lo's race and national origin were not motivating factors in First City's decisions not to promote and ultimately to terminate Lo.

*Conclusions of Law.*

1. This court has jurisdiction over the parties and the subject matter of this case.

2. Proof of discriminatory motive is critical in an individual disparate treatment case under Title VII. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977).

3. A plaintiff may establish a *prima facie* case of employment discrimination under Title VII by proving: (1) membership in a protected group; (2) qualification for the position; (3) an adverse employment action; and (4) replacement by a person not in the protected group. *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1980); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The plaintiff may also establish a *prima facie* case by showing that he is a member of a protected class, that he was qualified for the position, and employees outside the protected class were treated more favorably. *Waggoner v. City of Garland,* 987 F.2d 1160, 1163 (5th Cir.1993);

*Johnson v. Chapel Hill Indep. School Dist.,* 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R. Co.,* 760 F.2d 633, 639 (5th Cir.1985). A *prima facie* case creates a rebuttable presumption of intentional discrimination.

■ 4. Once the plaintiff has come forth with sufficient evidence to establish a *prima facie* case, the defendant must articulate a legitimate, non-discriminatory reason for any alleged unequal treatment. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824.

■ 5. Once a defendant has articulated a legitimate, non-discriminatory reason for its actions, the *prima facie* case is dissolved and the burden shifts back to the plaintiff to prove at a "new level of specificity" that the reason articulated by the employer is not true but is only a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094); *Waggoner v. City of Garland,* 987 F.2d at 1164; *Wood v. Exxon Corp.,* 674 F.Supp. 1277, 1285 (S.D.Tex.1987); *Smith v. Eastern Airlines, Inc.,* 651 F.Supp. 214, 219 (S.D.Tex.1986). The ultimate burden of persuasion remains at all times with the plaintiff. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

■ 6. In order to show pretext, the plaintiff must show both that the reason for the adverse employment action as put forth by the defendant is false and that discrimination was the real reason for the adverse action. *Id.* —— U.S. at ——, 113 S.Ct. at 2752. Mere disbelief of the employer's proffered reasons for its action is not enough, there must also be proof of intentional discrimination. *Id.*

■ 7. If the plaintiff introduces direct evidence of discrimination, he need not meet the *McDonnell Douglas prima facie* test. The burden is shifted directly to the defendant. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Young v. City of Houston,* 906 F.2d 177, 180 (5th Cir.1990).

■ 8. A plaintiff's subjective belief of discrimination, however genuine, cannot alone be the basis for judicial relief. *Little v. Republic Ref. Co.,* 924 F.2d 93, 94 (5th Cir. 1991); *Sherrod v. Sears, Roebuck & Co.,* 785 F.2d 1312, 1316 (5th Cir.1986); *Elliot v. Group Medical & Surgical Serv.,* 714 F.2d 556, 567 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984); *Taylor v. Houston Lighting & Power Co.,* 756 F.Supp. 297, 300 (S.D.Tex.1990). Lo's subjective belief of race and national origin discrimination is legally insufficient to support his claims under Title VII.

■ 9. Title VII protects employees against racial discrimination in the terms and conditions of employment. It does not, however, afford a minority special preference or place upon the employer an affirmative duty to accord minorities special treatment during layoffs. *See Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

10. In the instant case, the FDIC articulated a legitimate, non-discriminatory reason for Lo's non-promotion and layoff. Lo, who continued to bear the burden of persuasion, failed to demonstrate that the FDIC's articulated reason was merely a pretext for race or national origin discrimination. *St. Mary's Honor Center v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

■ 11. The FDIC demonstrated that First City was suffering economic losses which precipitated the need to lay off a number of employees, including Lo. First City followed internal procedures for determining which positions and functions could be eliminated without affecting the bank's efficiency. It also did a comparative analysis of all employees within the bank to determine which employees were not performing as well as others. As a result of that analysis, it was determined that Lo's job functions could be reassigned and that he was not performing as well as other analysts in the department. Thus, Lo's termination was not motivated by his race or national origin. Rather, it was motivated by economic and performance factors.

12. The FDIC also demonstrated that First City's failure to promote Lo was not precipitated by his race or national origin. After reviewing all of the qualifications needed to become a senior asset/liability analyst, First City determined that Thomas was better qualified. These are legitimate, nondiscriminatory reasons for the bank's failure to promote and ultimately to terminate Lo as part of a bank-wide layoff.

13. The only evidence that Lo offered to support a claim of race and national origin discrimination are the taped remarks made by Peterson stating that "all Chinese guys like to trade." These comments alone, however, cannot support Lo's race and national origin claims. When discriminatory comments are vague and remote in time and administrative hierarchy, they are no more than "stray remarks," insufficient to establish a pretext to discriminate. *Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). To rise above the level of a stray remark and constitute direct evidence of discrimination, a remark must: (1) be made by the decision maker or one whose recommendation is sought by the decision maker; (2) be related to the specific employment decision challenged; and (3) be made close in time to the decision. *Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir.1992).

14. In the instant case, Peterson's remarks do not constitute direct evidence of discrimination. Lo apparently construed Peterson's remarks in retrospect to mean that Peterson intended not to promote him and eventually to terminate him because he was of Chinese national origin and of the Asian race. Peterson made the comment, however, in the context of a counseling session with Lo, in which the bank was attempting to accommodate his interests, after Lo had demonstrated little enthusiasm for the asset/liability analyst position and had sought to discuss his position with his superiors. This comment did not relate to Lo's later inquiry about being promoted to the vacancy created by Onui's departure. Additionally, Peterson's remark was not related to any specific employment decision challenged by Lo, as it was made before Oniu resigned and long before Lo was terminated. Thus, it cannot be construed as evidence of international discrimination against Lo with respect to the employment decisions at issue in this case.

15. Although Peterson's comments are indicative of race-consciousness, they do not constitute direct evidence that discriminatory animus was a motivating factor in any of the decisions affecting Lo. *Langley v. Jackson State Univ.*, 14 F.3d 1070, 1075 (5th Cir. 1994); *Young v. City of Houston*, 906 F.2d at 182. To prevail, Lo must show that "the employer actually relied on [the forbidden factor] in making its decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989). Lo failed to introduce any evidence that First City actually relied on Peterson's remarks when deciding not to promote him and eventually, to discharge him.

16. Title VII incorporates the traditional mitigation of damages rule into its remedies provision, which imposes upon the complaining party a duty to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position lost. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982).

17. It is within the court's discretion whether to discount a backpay award by the amount of unemployment compensation earned by the plaintiff during the relevant period. *Johnson v. Chapel Hill Indep. School Dist.*, 853 F.2d at 382; *Matherne v. Wilson*, 851 F.2d 752, 762 (5th Cir.1988).

18. Lo is not entitled to attorney's fees under the Equal Access to Justice Act because the FDIC's position was substantially justified, as confirmed by the jury's verdict and this court's findings. *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *Perales v. Casillas*, 950 F.2d 1066, 1072 (5th Cir.1992). Nor is the FDIC liable for attorney's fees under other theories. *Interfirst Bank Abilene v. FDIC*, 777 F.2d 1092, 1097 (5th Cir.1985).

19. Because Lo failed to establish that race or national origin was a motivating factor in First City's decision not to promote him and ultimately to discharge him, First City did not violate Title VII of the Civil Rights Act of 1964 or the Texas Commission on Human Rights Act.

20. Any conclusion of law more properly characterized as a finding of fact is hereby adopted as such. Any finding of fact more properly characterized as a conclusion of law is hereby adopted as such.

*Conclusion.*

In accordance with the court's findings and the jury's verdict, Lo shall take nothing by his suit and judgment shall be entered for the FDIC.

IT IS SO ORDERED.