Rafael G. HERNANDEZ, Plaintiff,

v.

EXXON CORPORATION, Defendant.

Civil Action No. H–94–cv–4418.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 24, 1996.

Mark La Spina, Able & Monroe, Houston, TX, for Plaintiff.

Anthony P. Rosenstein, Baker & Botts, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Exxon Corporation's ("Exxon") Motion for Summary Judgment (#35). Exxon seeks summary judgment on Rafael G. Hernandez's ("Hernandez") claims of racial discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 as well as on Hernandez's breach of contract claim. Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that Exxon's motion for summary judgment should be granted in part and denied in part.

### I. Background

In 1977, Exxon hired Hernandez, an Hispanic–American, as an employee in its Marketing Department in Houston, Texas. Hernandez's sixteen and one-half year tenure at Exxon was marked by "frequent promotions and outstanding evaluations," and Hernandez was normally ranked higher than his Anglo–American peers in terms of performance. During the last four years of his employment, he was ranked within the top quarter of his peer group. Hernandez was also competitively ranked within the top quarter of his peer group when he was terminated in 1994.

By 1991—the time of the conduct cited as the grounds for his dismissal—Hernandez had risen to the position of district manager, with oversight responsibility for Exxon's company-owned retail stores ("CORS") for the State of Florida. At that point, he had attained job classification level ("CL") 28. When he was terminated in 1994, he had been further promoted to a staff manager position with a job classification of CL 29. He was then earning $125,000.00 per year, and, according to Exxon, was scheduled to receive another promotion to an "executive level" (CL 30) position in August 1995.

While serving as district manager in 1991, Hernandez had supervisory responsibility over a number of territory managers, who were responsible for stores in "defined territories throughout the state." These territory managers, in turn, had supervisory responsi-

bility over store managers who were in charge of individual stores. Other staff persons reported either to the territory managers or to the district manager. Hernandez reported to the Southern Region Manager, whose oversight area encompassed several states, including Florida.

In 1993, Exxon "discovered that it had been the victim of a major defalcation in the Tampa area." Tom Martino ("Martino"), who was hired by Hernandez, had created a fictitious "vendor" and had "diverted payments to this fictitious entity, and converted them to his own use." Martino was ultimately convicted and sentenced to prison for his conduct. As a result of this defalcation, Exxon launched an extensive audit investigation of the store managers, territory managers, and staff in Tampa, as well as others in management. The investigation revealed "numerous lapses in financial and business controls." Ultimately, Exxon discharged twenty-two individuals. Hernandez was terminated in February 1994. According to Exxon, everyone who was discharged, with the exception of Hernandez, was white. Hernandez maintains that "Exxon did not terminate similarly situated individuals who permitted an alleged conflict of interest, made the basis of Plaintiff's termination, and who were directly responsible for the major breakdown of business controls in Tampa, Florida." Additionally, Hernandez asserts:

> Exxon needed to ensure that an upper level manager was held accountable for the embarrassing economic and administrative breakdowns which occurred. Management chose to terminate Hernandez, the hispanic, almost three years after Hernandez had transferred to Houston. In doing so, they protected their white cronies whose conduct was far more culpable than Hernandez.

According to Exxon, the audit established that, in April 1992, Hernandez had approved an Employment Data Notice ("EDN") promoting Martino to store manager of a CORS location, thereby "establishing a direct reporting relationship to Gasper Martino, his father." Gasper Martino ("Gasper") was a territory manager with responsibility for a number of stores, including, according to

Exxon, Store # 49101, where Martino was manager. Exxon asserts that this situation violated the company's conflict of interest policy. Exxon maintains that it has a strong policy against conflicts of interest and offers an excerpt from its policy manual in support of its position:

> An employee may not approve or administratively control contracts or other business arrangements between the company and a member of the employee's immediate family ... [A]pproval ... of such contract should be referred to higher management. Full information concerning these relationships should be furnished to the manager of the appropriate Headquarters Department.

The policy manual also states:

> C. Employment of relatives of Company employees: Relatives of Company employees may be employed on a nonpreferential basis; however, an employee normally should not be employed by or assigned to work under the direct supervision of a relative.

Hernandez testified at deposition that he understands the policy's prohibition on relatives supervising their kin. According to Exxon, the conflict of interest policy applied to "Hernandez's situation because managers like him are expected to implement the COI policy." Exxon underscores the gravity with which the company views conflicts of interest by proffering that Exxon employees are asked each year to "sign an affirmation that they have not violated it." Hernandez confirmed that he had signed such statements. According to John Killian, Senior Human Resources Manager for the "marketing function," violations of the conflict of interest policy normally result in termination of employment. Exxon cites Hernandez's approval of the conflict of interest involved in the Martino situation as one reason for his termination.

Exxon further asserts that Hernandez's failure to cooperate and his evasiveness during the audit investigation also led to his termination. Specifically, when the topic of Martino arose, Hernandez, normally "articulate and incisive," became, according to the auditors, "defensive, evasive, and uncoopera-

tive." As one auditor, Wayne Wilkerson ("Wilkerson"), observed, "[w]e started getting into specifics. It seemed that the ability of Mr. Hernandez to recall the business and how it was operated was diminished substantially, that he did not have near the—knowledge or recall of that." Additionally, Wilkerson testified that Hernandez's recounting of the Martinos' work assignments "did not seem consistent with the facts."

The auditors conducted a second meeting with Hernandez in January 1994. By that time, the auditors had noted that it "appeared" that Hernandez had violated the conflict of interest policy. According to Wilkerson, in spite of "specific evidence" to the contrary, Hernandez continued to maintain that Martino had never reported to his father and that Martino had never been a store manager in Gasper's territory. After the auditors produced a document ostensibly reflecting Hernandez's approval of the reporting relationship among the Martinos, Hernandez acknowledged that the signature on the document was his. He now disputes the authenticity of the document as well as the signature appearing on it.

At the close of the second meeting, Wilkerson proposed that Hernandez draft a memorandum to him "setting forth Hernandez's position as to what had occurred in the Tampa area," taking into account the representations that he would like the auditors to make to management, and taking a few days to "consider the facts and his best recollection." In Hernandez's resulting memorandum, he maintained that Martino had never reported to his father; rather, Martino had been a CAAP representative, involved in introducing retail automation procedures to the CORS locations, reporting directly to Hernandez, not a store manager reporting to a territory manager.

The marketing management group established a standing committee to make disciplinary decisions stemming from the investigatory audit. According to Exxon, the auditors, while apprising management of their findings, played no role in the disciplinary actions imposed. The committee concluded:

1. Hernandez had given information to the auditors (both verbally and later confirmed in writing) which turned out to be false;
2. Hernandez had approved a conflict of interest, i.e., a son working for his father; and
3. Hernandez had been evasive and uncooperative with the auditors.

Gordon Thomson ("Thomson"), Vice–President of Marketing for Exxon, testified at deposition that Hernandez's being "uncooperative and nonforthcoming" during the investigatory audit was a "matter that concerned [Thomson] greatly and certainly was one piece of information which weighed heavily in [his] mind in this termination." According to Thomson, being uncooperative with the auditors is tantamount to "unacceptable performance," and, in light of this, Thomson had no choice but to terminate Hernandez. While Thomson ultimately made the decision, the other members of the committee testified that there was a consensus among them that Hernandez should be terminated.

Bill Cash ("Cash"), Hernandez's direct supervisor, who is African–American, met with Hernandez in February 1994 to inform him that he was going to be terminated. Cash had no role in the investigation, and, therefore, had no real background in the events that led up to Hernandez's discharge. Cash wrote a memorandum noting that Hernandez had acknowledged making an error in judgment, but nevertheless thought that he should not have been terminated. Hernandez called Jim Carter ("Carter"), Exxon's Fuel Products Manager, a few days later and asked him to review the decision. Carter invited Hernandez to meet with him. Thomson, after discussing Hernandez's request with Carter, instructed Carter to meet with Hernandez, review the termination decision, and recommend to Thomson whether the decision should be reversed. The meeting was attended by Hernandez, Carter, and Killian. According to Hernandez's deposition testimony, he was shown the document assigning Martino to the position of store manager. Hernandez suggested that the document might be a forgery and pointed out

irregularities in the form of the EDN. Carter and Killian testified that, after the meeting, they were optimistic that they might be able to find independent substantiation for Hernandez's assertions and reverse the termination decision. According to Exxon, their independent investigation bore no such fruit, but rather confirmed that Martino had been a store manager who reported directly to his father, a territory manager, contrary to Hernandez's assertions. As a result, Carter and Killian did not recommend that the termination decision be reversed.

## II. *Analysis*

### A. *The Standard for Summary Judgment*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the non-movant's case. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047

(5th Cir.1996); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1069, 1075. The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, neither " 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace*, 80 F.3d at 1047 (quoting *Little*, 37 F.3d at 1075). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–323, 106 S.Ct. at 2552.

### B. *Title VII and § 1981* [1]

#### 1. *Burden of Proof*

■ Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to

---

**1.** While Hernandez originally claimed discrimination on the basis of national origin in his Equal Employment Opportunity Commission ("EEOC") charge of discrimination, but now claims discrimination based on his race, that distinction does not appear to be problematic under § 1981. As the Fifth Circuit has held, "we will treat the case as asserting a claim under § 1981 whether he labels that discrimination as based on 'national origin' or on 'race.'" *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.*, 807 F.2d 1214, 1218 (5th Cir.), *modified in part on other*

grounds, 819 F.2d 545 (5th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988). Hernandez's assertion that he is Hispanic–American is sufficient to bring him within the confines of § 1981. *See Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987); *see also Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634–35 (5th Cir.1981); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970–71 (10th Cir.1979); *Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir.1971), *aff'd*, 593 F.2d 577 (5th Cir.1979).

discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "Section 1981 provides that all persons in the United States shall have the same contractual rights as white citizens." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir.1996); *see also* 42 U.S.C. § 1981(a). More specifically, § 1981 states that every person in the United States has the same rights as white citizens with regard to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In *McDonnell Douglas* and *Burdine*, the United States Supreme Court outlined the burden-shifting framework generally applicable in Title VII and § 1981 cases.[2] *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). At all times, the plaintiff has the ultimate burden to prove intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Marcantel v. Department of Transp. & Dev.*, 37 F.3d 197, 200 (5th Cir.1994). Moreover, the burden-shifting approach may be dispensed with altogether if the plaintiff is able to establish intentional discrimination by direct evidence of discriminatory motive. *See Wallace*, 80 F.3d at 1047–48; *Kendall v. Block*, 821 F.2d 1142, 1145 (5th Cir.1987); *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir.1980).

 In the absence of direct evidence of discrimination, a plaintiff must initially establish a *prima facie* case by satisfying a four-element test from which discriminatory mo-

tive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *Wallace*, 80 F.3d at 1047 (citing *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94). Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Davis*, 14 F.3d at 1087; *see also Marcantel*, 37 F.3d at 199. If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Marcantel*, 37 F.3d at 200; *Moham v. Steego Corp.*, 3 F.3d 873, 875 (5th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason was false and that race discrimination was the real reason. *See St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. at 2751–52. The Fifth Circuit has formulated the plaintiff's burden under *St. Mary's Honor Ctr.* as one of establishing that the employer's nondiscriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1249 (5th Cir.1995). "Under *Hicks*, '[i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519, 113 S.Ct. at 2753–54).

 An employee's own subjective belief of discrimination, however genuine, cannot

---

**2.** Absent direct evidence of discriminatory intent, the *McDonnell Douglas* burden-shifting framework applies to § 1981 claims. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *LaPierre*, 86 F.3d at 448 n. 2; *see also Wallace*, 80 F.3d at 1047–48. Additionally, the Fifth Circuit has regarded the elements of § 1981 claims to be sufficiently similar to Title VII actions to warrant

the same analysis in many instances. *See Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 n. 7 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995); *see also LeJeune v. Avondale Indus.*, No. 95–2600, 1996 WL 225029, at *3 (E.D.La. May 1, 1996). Therefore, for purposes of this analysis, Hernandez's claims under Title VII and § 1981 are discussed simultaneously.

serve as the basis for judicial relief. *See, e.g., Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.1996); *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996); *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Little v. Republic Ref. Co.,* 924 F.2d 93, 96 (5th Cir.1991). Although Title VII protects employees against racial discrimination in their terms and conditions of employment, it does not afford minorities special preference or place upon the employer an affirmative duty to accord them special treatment. *See Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Furthermore, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988); *see also Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *Waggoner v. City of Garland,* 987 F.2d 1160, 1165 (5th Cir.1993); *Thornbrough v. Columbus & Greenville R. Co.,* 760 F.2d 633, 647 (5th Cir.1985).

### 2. *Discharge Claim*

 Hernandez claims that he was the victim of disparate treatment due to his race because he was the only manager terminated as a result of the audit investigation. In order to proceed on a discharge claim under a disparate treatment theory of racial discrimination, a plaintiff must satisfy the *prima facie* case requirement by demonstrating that:

1. he is a member of a protected group;
2. he was qualified for the position;
3. he was discharged; and
4. after his discharge, the position was filled by a person not within his protected group.

*Singh v. Shoney's, Inc.,* 64 F.3d 217, 219 (5th Cir.1995); *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990) (citing *Norris v. Hartmarx Specialty Stores, Inc.,* 913 F.2d 253, 254 (5th Cir.1990)). A plaintiff may establish a prima facie case of disparate treatment in other ways, as well. "A plaintiff proceeding on a disparate theory of employment discrimination must show disparate treatment and discriminatory motive." *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375 (5th Cir.1988) (citing *Lee v. Conecuh County Bd. of Educ.,* 634 F.2d 959, 962 (5th Cir.1981)). A plaintiff can satisfy the burden of establishing a *prima facie* case, however, by proffering evidence of disparate treatment alone. *Johnson,* 853 F.2d at 381; *Lee,* 634 F.2d at 962. A plaintiff can show that he is in a protected class, that he was qualified for the job in question, and that "employees outside the protected class were treated more favorably." *Waggoner,* 987 F.2d at 1163–64 (citing *Thornbrough,* 760 F.2d at 639). The employer may then, just as under *McDonnell Douglas* or *Burdine,* "rebut this prima facie case by articulating a legitimate nondiscriminatory reason for the differential treatment." *Johnson,* 853 F.2d at 381; *Lee,* 634 F.2d at 963.

 Here, Hernandez satisfies the first element of either variation of the test by virtue of his being Hispanic–American. Although the parties dispute whether he has established the second element, *i.e.,* that he was qualified for the position in which he was employed, the uncontested evidence shows that he was consistently among the top performers in his peer group, he received frequent promotions and outstanding evaluations, and ranked in the top quarter of his peer group at the time of his termination. Exxon contends that after it was determined that Hernandez had approved the conflict of interest and had been evasive during the investigation, he became unqualified for the position. *See Douglas v. Anderson,* 656 F.2d 528, 533 (9th Cir.1981). As that case makes clear, however, "[i]n establishing a *prima facie* case, [the plaintiff] need only produce substantial evidence of satisfactory job performance sufficient to create a jury question on this issue." *Id.* at 533 n. 5. Hernandez

has met this burden. Therefore, Hernandez has satisfied the second element of a *prima facie* case.

■■■ As for the third and fourth elements, Hernandez has shown that he was discharged and that the employee who replaced him was white. He has also demonstrated that non-minority employees, who were also involved in the conflict of interest, were retained, while he was terminated. In a case such as this, where misconduct is cited as the reason for discharge, Hernandez may establish a *prima facie* case by showing "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained." *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1185 (11th Cir.1984) (citing *Davin v. Delta Air Lines, Inc.*, 678. F.2d 567, 570 (5th Cir. 1982)).

■■■ Exxon asserts that no employee who both knew of and approved the conflict of interest and was also evasive and uncooperative during the investigation was retained. Hernandez counters with the assertion that he, the Hispanic–American, was the only manager who was discharged as a result of the investigation, while upper management "protected their white cronies." Hernandez maintains that he was the "only manager terminated as a result of allegedly permitting a COI, though the managers who succeeded to his responsibilities not only permitted any such COI, but also showed unacceptable performance more flagrantly by allowing the breakdown of the business controls to occur as well." Exxon's interpretation of the concept of similarly situated employees appears to be unduly restrictive. Hernandez's status as the only manager who was discharged, despite his rather limited involvement with the subsequent illegal diversion of funds from the company, coupled with the fact that non-minority managers more proximately involved in the defalcation were treated relatively forgivingly, is sufficient to meet the standard articulated in *Waggoner.* Therefore, Hernandez has established a *prima facie* case of race discrimination under either formulation of the test.

■■■ Exxon has articulated legitimate, nondiscriminatory reasons for Hernandez's termination—namely, that he was responsible for the conflict of interest and was at least evasive and possibly even untruthful during the audit investigation. The next inquiry, therefore, is whether the proffered reasons are merely pretextual. A plaintiff may succeed in demonstrating pretext " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Marcantel,* 37 F.3d at 199 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Exxon contends that there was no employee whose misconduct was "nearly identical" to that of Hernandez who was not terminated. Exxon notes that twenty-two individuals were terminated as a result of the audit investigation, all of whom, with the exception of Hernandez, were white. The record further supports the inference that the company had been pleased with Hernandez's work up until that period of time and was supportive of his advancement. Exxon maintains that Hernandez "approved" the conflict of interest, while the other managers did not. On the other hand, Hernandez's assertion that he was the only manager who was terminated, although other managers were aware of and tacitly approved the conflict of interest and acted "more flagrantly," appears to be viable. There is a dispute concerning the authenticity of the EDN and other documentary evidence suggesting that Hernandez formally "approved" a conflict of interest relationship between Gasper and Martino. Moreover, the EDN and documentary evidence provide, at most, a rather tenuous distinction between Hernandez's supposed "approval" of the conflict of interest and the other managers' failure to exercise adequate oversight over Martino, which ultimately led to the later defalcation. Even assuming its authenticity, it is not apparent on the face of the EDN that Martino was to report directly to Gasper. It contains only a numerical code ostensibly connecting the Martinos. Exxon management itself seems to be at odds over how firm or direct that connection was. Furthermore, the Exxon policy manual states only that an employee

should not *normally* be assigned to work under the direct supervision of a relative; it does not absolutely prohibit such an assignment.

Additionally, the record reflects that Hernandez left Florida well before the defalcation occurred. Hernandez allegedly "approved" the conflict of interest on April 22, 1991, but was transferred to Houston from Fort Lauderdale in June 1991. In short, he had only a limited opportunity to observe or correct a possible conflict of interest in Tampa. Moreover, Martino was transferred out of the position from which the alleged conflict arose by October 1991, at the latest, and other territory managers, besides Gasper, were in place in the area prior to that time. As Thomson conceded at deposition, the conflict of interest was not in effect when Martino diverted funds from Exxon. The overall "control problems," on the other hand, continued into 1993. With respect to the magnitude of the loss, while Martino may have defrauded the company of $80,000.00, the various lapses in financial and business controls uncovered by Exxon resulted in losses ranging from $300,000.00 to $500,000.00. Exxon management concedes that the purported conflict of interest "caused no monetary damage to Exxon at all." Other managers were responsible for the deficient controls that led to these sizable losses. Hence, viewing the evidence in the light most favorable to Hernandez, fact issues exist as to whether a conflict of interest existed and, if so, whether Hernandez approved it. Moreover, even if he did approve a conflict of interest, it has not been shown that Hernandez's alleged "approval" of the conflict of interest was materially different from the other managers' conduct.

While Hernandez's subsequent "evasiveness" is problematic, this court cannot say that Hernandez was not earnestly disputing Exxon's version of events, especially in view of the conflicting testimony by Exxon management over the existence of a conflict of interest, the gravity of the conflict of interest, and the "window" of opportunity for a conflict of interest to exist. As for his purported uncooperative behavior during the investigation, such evaluations of Hernandez's behavior were merely subjective assessments by the auditors of his demeanor while they were confronting him with allegations that were tenuous, at best, of his approval of a conflict of interest. Moreover, according to Hernandez, the auditors treated him rudely, tried to intimidate him, yelled at him, and refused to allow him to ask questions. As noted above, the policy manual merely states that an employee should not *normally* be assigned to work under the direct supervision of a relative. It does not prohibit such an assignment or provide any guidelines as to when such a reporting relationship might be appropriate.

Here, the testimony from Exxon managers that the EDN was "irregular," that the conflict of interest Hernandez allegedly allowed to exist did not result in any financial loss to the company, that the defalcation occurred under other managers, and that the lapse in controls under other managers resulted in huge financial losses without major repercussions for any of them, all point to the existence of pretext. The fact that various white managers were not terminated after what appeared to be comparable or more egregious managerial lapses, given the nature and size of the ultimate losses, raises the specter of racial discrimination. Exxon's position that permitting a conflict of interest to exist is chargeable to the manager who permits it and is considered by the company to be a serious breach of policy, arguably required the termination of any manager who allowed it, including the white managers in this situation. In addition, Hernandez's testimony regarding racial slurs, as well as the suggestion that he take "speech lessons," also contribute to a potential finding of pretext. Finally, while Exxon contends that this court's inquiry should be limited under *Waggoner* to "whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief," fact issues are inherent in that inquiry, as well.

Therefore, summary judgment is not warranted on Hernandez's discriminatory discharge claim.

### 3. *Promotion Claim*

Hernandez claims that he was not promoted because he is an Hispanic–American. In order to establish a *prima facie* case of failure to promote under Title VII or § 1981, a plaintiff must show that:

1. he is a member of a protected group;
2. he applied for a position for which he was qualified;
3. he was rejected; and
4. after he was rejected, the employer promoted or continued to seek other individuals not in the protected group.

*Uviedo v. Steves Sash & Door Co.,* 738 F.2d 1425, 1428 (5th Cir.1984), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824); *Page v. U.S. Indus., Inc.,* 726 F.2d 1038, 1055 (5th Cir. 1984).

Here, Hernandez's failure to promote claim is without basis. He provides insufficient summary judgment evidence to establish the existence of a position to which he sought a promotion, much less to show that he was rejected for any such position, that others not within his protected group were promoted, or that the company continued to seek other candidates after they rejected Hernandez. Hernandez is evidently contending that he was denied a promotion to a potential position in Finland, although he had previously told his supervisor that he would only be interested in the position if it was at the CL 30 salary level or above. The position, however, was classified at the CL 28 or 29 level. Discrimination cannot be inferred from Cash's comment that "for [Hernandez] it will be a 29 level." Furthermore, there is no evidence of an official opening or that the position was ever filled. In short, Hernandez has satisfied only one requirement of a *prima facie* case—that he was a member of a protected group.

Thus, summary judgment is proper as to Hernandez's failure to promote claim.

### C. *Breach of Contract*

Hernandez contends that Exxon breached a 1977 contract, entitled "Contract of Employment," when the company failed to pay him two months severance pay, after it terminated him without cause and without notice. The contract provides:

> It is understood and agreed that EXXON shall have the right to terminate EMPLOYEE'S services at any time by giving EMPLOYEE two (2) months notice of the termination of his employment or, without notice, by paying EMPLOYEE an amount in advance equal to two (2) month's salary at his then current rate. It is further understood, however, that nothing herein contained shall prevent the discharge of EMPLOYEE for cause without notice and without payment of unearned salary.

Exxon asserts, however, that the 1977 contract was superseded by another contract, signed in 1989, which terminated any such right to severance pay. The relevant clause in the 1989 contract, entitled "Confidentiality and Invention Agreement," states that it "shall supersede and replace all prior oral and written communications, representations, understandings and agreements between the Company and me, with respect to the subject matter of the agreement."

The term "subject matter of the agreement," however, is ambiguous. It is unclear whether "the subject matter of the agreement" refers to anything other than confidentiality and inventions. While the 1977 contract contains certain provisions addressing confidentiality, it includes far more expansive terms dealing with other employment-related issues. The 1989 confidentiality and inventions agreement does not appear to be a wholesale rewriting or revision of the 1977 employment agreement. As Hernandez points out, "[a]t a minimum, a fact question exists as to whether the intent of the Agreement is to supersede the severance benefits and cause provision of the Contract." Under Texas law, an inquiry into the parties' intent with respect to a contractual ambiguity is appropriately considered a question of fact. *See, e.g., In re Texas Gen. Petroleum Corp.,* 52 F.3d 1330, 1335–36 (5th Cir.1995); *Thrift v. Hubbard,* 44 F.3d 348, 358–59 (5th Cir. 1995); *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987); *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983);

*Staff Indus., Inc. v. Hallmark Contracting, Inc.,* 846 S.W.2d 542, 546 (Tex.App.—Corpus Christi 1993, no writ). Here, there exists an ambiguity as to the meaning of the 1989 contract with respect to its effect on the 1977 contract, thus precluding any determination as a matter of law that the severance pay provisions of the 1977 employment contract were not in effect at the time of Hernandez's termination.

Similarly, "[t]he issue of whether an employer had good cause to discharge an employee is a question of a fact, unless the conduct involved and effect on the employer's business are clear, in which case it is a question of law." *Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 580 (Tex.App.—Houston [1st Dist.] 1992, no writ). In other words, the question can be considered one of law only when "the discharged employee's misconduct is undisputed and the effect on the employers' business is clear." *Watts v. St. Mary's Hall, Inc.,* 662 S.W.2d 55, 58 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). With regard to the issue of good cause for discharge, the court in *Lee–Wright, Inc.,* explained:

> Good cause for discharging an employee is defined as the employee's failure to perform the duties in the scope of employment that a person of ordinary prudence would have done under the same or similar circumstances. An employee's act constitutes good cause for discharge if it is inconsistent with the continued existence of the employer-employee relationship.

840 S.W.2d at 580; *see also Dixie Glass Co. v. Pollak,* 341 S.W.2d 530, 542–43 (Tex. App.—Houston, 1960, writ ref'd n.r.e.).

Here, in view of the conflicting evidence, Exxon has not established as a matter of law that it had just cause to discharge Hernandez. It cannot be said that the conduct involved was "clear." Hernandez continues to dispute the authenticity of the document purportedly establishing his approval of the alleged conflict of interest. Moreover, without regard to its authenticity, Hernandez maintains that he was not guilty of any misconduct for which he should have been discharged. Furthermore, it has not been shown that the effect on the company of any misconduct on the part of Hernandez was

"clear." While the conflict of interest may have existed while Hernandez was in Florida, a reasonable jury could also find that the conflict of interest, by itself, had no discernible effect on the company, particularly in light of the fact that the later defalcation occurred during the tenure of other managers.

Therefore, the existence of material questions of fact preclude summary judgment on Hernandez's breach of contract claim.

### III. *Conclusion*

There are no outstanding issues of material fact with respect to Hernandez's failure to promote claim, and Exxon is entitled to judgment as a matter of law with respect to that claim. Accordingly, summary judgment is GRANTED as to Hernandez's claim that he was denied a promotion due to his race.

With regard to Hernandez's discriminatory discharge claim under Title VII and § 1981, as well as his breach of contract claim, there exist outstanding issues of material fact which preclude summary judgment. Therefore, summary judgment on these claims is DENIED.

IT IS SO ORDERED.